## STATE v. W. W. ROLLINS.

*Murder — Evidence — Res Gestæ — Impeachment of Witness—*
*Character of Deceased—Excessive Force—Instructions to Jury.*

1. A witness, on a trial for murder, testified that on the night of the homicide, and near her house, she heard men cursing and quarreling, one saying, "I will cut his throat." In answer to her cries of "Murder," two or three men came to her door. The defendant proposed to ask her what she said to the men who came to her door, the purpose being to show that she told them that the men who were quarreling were cutting a man's throat, and to thus corroborate her statements on the trial : *Held,* that the question was properly excluded as irrelevant and immaterial, since what she said to the men would not have served to corroborate her as to what she *saw,* but only to show her belief or surmise. at the time, of the nature of the occurrence.

2. What a defendant charged with murder said to a witness, who, hearing pistol shots, ran to the scene of the homicide, arriving there between the third and fourth shots, and while several men present were struggling with each other, was competent as a part of the *res gestæ,* and also as corroborative of his testimony of the transaction as given on the trial.

3. While error in excluding competent testimony is cured by afterwards admitting it from the same witness, it is not cured by admitting another to testify to the same purport.

4. Where a witness for the State, in a trial for murder, testified as an eyewitness to the homicide, and on cross-examination stated that he was not drunk, it was error to exclude proof offered to show that he was "very drunk on that occasion," such proof not being intended to impeach his character (in which case, his answer on cross-examination as to his condition, would have been conclusive), but serving to contradict and impair his evidence, and to show his incapacity to know and remember with accuracy what took place.

5. Where, in a trial for murder, though the plea of self-defence was set up, it did not appear that defendant knew the character of the deceased for violence, evidence as to such violent character was properly excluded.

6. Where a person is lawfully under arrest, and another attempts to rescue him, the officer in resisting such arrest is justified in using such force as would ordinarily be considered excessive, provided he acts in good faith and without malice.

7. But where an officer, having lawfully arrested a person and in resisting an attempted rescue, uses such signal force that death is caused thereby, there is no presumption of law that he acted without malice and in good faith, *i. e.*, without excess of force; it being for the jury to judge of the reasonableness of the force used, and for the defendant to show matter of excuse or mitigation.

8. Good faith and want of malice apply as to extent of force used by an officer in resisting a rescue of a prisoner, when the arrest is legal, but do not validate an illegal arrest; hence, when a person submits to arrest and a rescue is attempted, the officer may not resist such rescue or use such force as is necessary to prevent the rescue if the original arrest was unlawful.

9. When a person is lawfully in the custody of an officer and a rescue is attempted, the officer may arrest the person attempting the rescue and may use such force as is necessary,

10. The use of a deadly weapon is proof of malice, for which one charged with murder must show excuse or mitigation; hence, where the killing of a person was admitted or conclusively shown to. have been done by the prisoner, a prayer for an instruction to the jury that, if the facts of the homicide are in doubt "and the jury are unable to say how the deceased came to his death and under what circumstances, the jury will render a verdict of 'not guilty,'" was properly refused as inapplicable to the facts.

11. While, if the fact of killing by one on trial for murder is in doubt, it would be proper to instruct the jury that "if there is a reasonable hypothesis, supported by the evidence, which is consistent with the prisoner's innocence, then it is the duty of the jury to acquit," yet, where the killing by the prisoner is admitted or conclusively proven, such an instruction is not permissible as to matters of excuse or mitigation, the burden of proving which is upon the prisoner.

12. While the Court may not single out a witness or witnesses and charge the jury that they must find in a designated way, if they believe such witnesses, yet, if the opposite state of facts and the law applicable thereto have been called to the attention of the jury, it may properly tell the jury that if they believe a certain state of facts as deposed to by certain witnesses, then the law applicable is so and so, for thus the attention of the jury is directed not to the credibility of the witnesses, but to a certain state of facts or hypothesis.

13. On the trial of a policeman for murder, the Court charged that an officer may arrest without warrant for a breach of the peace committed in his presence, but that he must, unless a known officer, notify the person that he is an officer, and if he fail to do so, espe-

cially on demand, the arrest is illegal and may be lawfully resisted by the person arrested; and if the person making the arrest kill any one of those resisting it, he would be guilty of murder unless exces_ sive force was used by those resisting it, in which latter case he would be guilty of manslaughter: *Held*, that the instruction was proper and not objectionable as expressing an opinion that defendant was or was not a known officer.

14. On the trial of a policeman for murder of a person attempting a rescue of another under arrest, the Court charged the jury that "where the arrest is made legally, by a lawful officer, he may use the amount of force necessary to prevent an escape or rescue, and no more, and if he use excessive force and death results, he is guilty of manslaughter; but, if excessive force is used and he intentionally slays the person resisting arrest or attempting the rescue, he is guilty of murder": *Held*, that while it would have been proper for the Judge to add that what would be excessive force in an individual in an ordinary encounter might not be so in an officer resisting the escape or rescue of a prisoner, yet the omission to so charge when not asked to do so was not error. An officer is not clothed with authority to judge arbitrarily of the necessity for killing, but that is a matter which the jury must judge in each instance.

Indictment for murder, tried before *Bryan, J.,* and a jury, at March Term, 1893, of DURHAM Superior Court.

There was a verdict of " not guilty of the felony and mur · der as charged in the bill of indictment, but guilty of the felonious slaying." From the judgment thereon the defendant appealed.

Defendant was a policeman of the town of Durham, assigned to special duty in a locality called "Smoky Hollow," just beyond the corporate limits of the town, the locality being inhabited, for the most part, by lewd women. On the evening of the homicide he was drunk and called, in company with Dick Happer, at a house of ill fame kept by Nan White. While in Nan White's room, deceased and his brothers, John and Charles, stopped at the house. As to the circumstances connected with and leading up to the homicide, John Jones testified for the State, that he went upon the porch and knocked at the door, and was told by the woman

that he could not come in. He knocked again, and defen-
dant came up the steps and took him by the arm, advising
him that he was under arrest. Witness asked him to show
his authority, and defendant did not do so. Happer took
witness by one arm, and defendant took him by the other;
and deceased came up, and told them to turn witness loose,
saying that he would take charge of him. This defendant
refused to do, and on being asked by witness to show his
authority, pulled out his pistol and shot deceased. Before
defendant shot, deceased took witness by his left arm and
tried to get him out of defendant's hands. Witness and
deceased then ran off in different directions, and deceased
died an hour later. Dr. A. Cheatham was called, and testi-
fied that defendant died from a pistol wound in the stomach.
After introducing witnesses to testify to the good character
of John Jones the State rested.

Dick Happer testified in behalf of the defendant, that on
the night of the homicide he and defendant visited Nan
White's house. Defendant went into her room, and witness
into another room. Witness heard some one kicking at the
door about fifteen minutes after. Witness heard a voice say:
"It takes a damn good man to carry me up town." Then
he heard defendant say: "Well, you will have to go." Wit-
ness went out and found deceased and his two brothers and
defendant on the porch. One of them asked defendant to
show his authority, and defendant said, "Here is my author-
ity," and showed his badge. At defendant's request witness
took John Jones's hand, and they started up town, deceased
and Charles Jones following them. Witness heard someone
running up behind them, and looking back saw deceased
and Charles right behind them. Deceased grabbed defen-
dant on the shoulder and said, "You damn son of a bitch,
you sha'n't carry my brother off!" Charles also seized
defendant, and a struggle ensued. One of them said, "Cut
his damn throat." Defendant fell, and deceased struck him,

witness at the same time having his arms around deceased's waist. Charles had defendant by the throat and said, "Cut the damn son of a bitch's throat." Then a pistol was fired twice, and deceased said, "The damn son of a bitch has shot me twice. Defendant called out "Help," or "I'll give up," and witness ran for a policeman, and told him that defendant had tried to arrest some men in Smoky Hollow; that they had jumped on him, and the policeman had better go there quick. Mrs. Brandon's house was the closest house to the shooting. ·

Nan White testified that while Rollins was in her room some men came on her front porch and kicked the bottom of her door. She stepped into the hall and told them that she was sick, and that there was no one to see them, and asked them to go away. The kicking continued, and she requested defendant to go out and take them away. The kicking at the bottom of the door was so severe that one of the panels was broken loose.

Mrs. Mary Brandon testified in substance: "I live on East Main street, near where Reams avenue runs into it. I live on left-hand side of street. No fence around my house; none in front; a wire fence at the side. The night of the homicide I was at my house, and heard some men coming from towards the railroad. They were coming towards town. There was cursing going on among them. Just as they got to the fence at my house the cursing was loudest. I heard a man say, 'I'll cut his throat.' Then a pistol fired, and then, right straight, another. Some one said, 'I will cut his G—d d—n throat. I'll cut his head off.' I opened front door, and shut it. Went to back door and hollered 'Murder' four or five times. Two or three came to my back door. Jasper Phipps was the only one I knew." Defendant asked witness, "What did you say to those that came to your door?" The State objected, and the answer was ruled out. The defendant excepted. (This was the *first* exception.) Defen-

dant stated the purpose of the question to be to show that she said to those that came up that they were killing a man at her door; that they were cutting a man's throat at her door, and insisted that it was competent as a part of the *res gestæ*, and that it tended to corroborate witness in what she now says. Witness had not been attacked.

Jim Potts, a witness for defendant, testified as follows: "I was in Smoky Hollow the night of the homicide, at Lilly Bennett's about three hundred and fifty yards from Mrs. Brandon's—back of Nan White's. Heard two pistol shots. Sounded as if shot in a box or house. Heard someone, in a woman's voice, holler 'Murder.' I saw Mrs. Brandon in her door, hollering 'Murder.' She continued till I got there. I ran around to the front door. Saw defendant and Jasper Phipps, and some more men in front. I went on after them. Pretty soon Rollins overtook one, and caught hold of him. Phipps was in front of Rollins a little bit. By that time had gotten out of my sight. I kept going towards Rollins. Saw the blaze of a pistol. By that time I had gotten up to Rollins." Defendant then asked, "What did Rollins say to you as you ran up, between third and fourth shots?" State objected. Defendant stated that he expected to prove that defendant said, "Catch hold of this man; he has tried to kill me"; and insisted on its competency as a part of the *res gestæ*. The answer was excluded, and defendant excepted. (This was the *second* exception.)

The witness further said: "I don't know who fired those last two shots. I could see the blaze, but it was too dark for me to see who shot. Rollins did not. I caught hold of the man that Rollins had. It was Charles Jones. Phipps was standing near, with John Jones." The defendant asked, "What was John Jones's condition?" The State objected. The defendant stated that he expected to prove that he was very drunk, to contradict John Jones, to impeach his credit as a witness and as a circumstance corroborating defendant's

contention of self-defence. The answer was excluded and defendant excepted. (This was the *third* exception.)

J. W. Bradford testified, in substance, that he was Chief of police of Winston; that he knew the deceased, Sandy Jones, and knew his general character. The defendant offered to prove by this witness that the deceased, Sandy Jones, was a man of most violent and dangerous character. The State objected. The defendant insisted on its competency, there having been introduced evidence going to establish self-defence, and further, as a circumstance going to show whether the said deceased introduced the knife into the difficulty, the evidence on this point having been circumstantial. The evidence was excluded, on the ground that it was not shown that the defendant knew deceased or his character, and that the evidence of the homicide is not circumstantial, and defendant excepted. (This was the *fourth* exception.)

Among the instructions requested by the defendant the following were refused and such refusal duly excepted to under exceptions from *five* to *ten,* as referred to in the opinion:

"9. If the jury shall believe that the said John D. Jones was under lawful arrest and in the custody of the defendant, and that the deceased, Sandy Jones, and Charles Jones, either or both of them, attempted to rescue the said John D. Jones from such custody, then the defendant, in resisting such attempt, would be protected in the use of such force that a jury would ordinarily consider excessive, if the defendant was acting in good faith and was free from malice.

"10. If the jury believes that the said John D. Jones was under lawful arrest, in the custody of the defendant, and that the deceased, Sandy Jones, or Charles Jones, both or either of them, attempted to rescue said John D. Jones from such custody, then the law presumes that in resisting such rescue the defendant acted in good faith and free from the influence of malice.

"11. If the jury shall believe that John D. Jones submitted to arrest by the defendant, and submitted to remain in the custody of the defendant, and after the defendant and the said John D. Jones walked together for the distance of twenty or thirty yards, and if the jury believe that the deceased, Sandy Jones, or Charles Jones, or both or either of them, attempted then to rescue the said John D. Jones from such custody, the defendant had the power and authority to resist such rescue, even though the original arrest was unlawful, and, to use such force as was necessary to prevent such rescue and escape.

"12. If the jury shall believe that after John D. Jones was arrested by the defendant, the deceased, Sandy Jones, or Charles Jones, both or either of them, assaulted the defendant, then the defendant had the power to arrest said Sandy Jones, or Charles Jones, or both of them, for such an assault, and to use such force as was necessary to make such arrests. (This was given with a modification, providing that the arrest of John D. Jones was lawful.)

The sixteenth and eighteenth prayers for instructions, which were refused, are set out in the opinion.

The following charges were given at the request of the State, and excepted to by defendant:

"1. That the killing having been admitted or proven to have been done with a deadly weapon, it devolves upon the prisoner to show to the jury facts or circumstances to mitigate or excuse the crime, and if the testimony does not satisfy them of the mitigating facts and circumstances, then it is their duty to convict of murder." To this the defendant excepted (Exception 11), and assigned as error that the instruction not only ignores, but contradicts the principle that an officer, in resisting a rescue, is presumed not to use excessive force, nor to have been actuated by malice; the evidence having established he was a police officer, within his jurisdiction and territory.

"2. That if the jury shall find that John Jones was doing no more than knocking at the door of Nan White's house, and asking for admission, as testified to by the said John Jones, W. B. McCullock and Charles Jones, then the Court charges that the said John Jones was commiting no offence, and his arrest was illegal, and that he had the right to resist the arrest, and the deceased had the right to aid him in so doing, and that right existed as long as the arrest continued, and they had the right to use the necessary force to free said John Jones; and the killing of Sandy Jones, in resisting his attempts to free said John Jones, would be murder, unless excessive force was used by the said Sandy, or those acting with him, and, if excessive force was so used, then the crime would be manslaughter" The defendant excepted (Exception 12), and assigned as error that his Honor erred in singling out and naming certain State's witnesses, and telling the jury that if they believed what they said, they would find such and such a verdict, thus giving their testimony undue prominence and dignity, and further insists that the right to resist unlawful arrest was personal to the one arrested, and did not extend to deceased, nor did it extend after John Jones had peacefully submitted.

"3. That an officer may arrest without warrant for a breach of the peace committed in his presence, but he must, unless a known officer, notify the person that he is an officer and has authority, and if he fails to do so, especially upon demand, then the arrest is illegal and may be lawfully resisted by the party arrested or third persons; and the person making the arrest, slaying any one of those making the resistance or rescue, would be guilty of murder, unless excessive force was used by those resisting, and then he would be guilty of manslaughter." The defendant excepted (Exception 13), and assigned for error that there is no evidence that defendant was not a known officer, the only evidence on that question being that he had been a policeman of the town, and recog-

nized as such, for more than six months; that if he were an officer, though not known to the one arrested to be such, his said failure would not make an arrest illegal; and, further, that the right to escape, even from illegal arrest, was personal to the party so arrested, and did not extend to third persons.

"4. That where the arrest is made legally, by a lawful officer, then he may use the amount of force necessary to prevent an escape or rescue, and no more, and if he uses excessive force, and death results, then he is guilty of manslaughter; but, if excessive force is used, and he intentionally slays the person resisting arrest or the person attempting the rescue, he is guilty of murder." The defendant excepted (Exception 14), and assigned for error that his Honor failed to tell the jury that what would be excessive force in an individual in an ordinary encounter would not be so in an officer resisting the escape or rescue of a prisoner; and further, that in using the phrase, "if excessive force is used," his Honor failed to tell the jury by whom the excessive force, if used, led to such a conclusion and left them to infer that, if used by anyone, either defendant or deceased and his associates, the same conclusion followed, which was erroneous.

*The Attorney General* and *Messrs. Fuller & Fuller*, for the State.

*Messrs. W. A. Guthrie, Boone & Parker* and *J. S. Manning*, for the defendant (appellant).

CLARK, J.: *Exception 1.*—The question was properly ruled out. It would not have served to corroborate witness as to what she saw, which would have been competent, but only to show her belief or surmise at the time of the nature of the occurrence. It was simply irrelevant, and could throw no light upon the facts attending the homicide. There was no attempt to "cut off the head" of anyone. That the witness thought and said otherwise that night, when she saw nothing that took place, is immaterial.

*Exception 2.*—The question was improperly excluded. It was competent to show the declaration of the prisoner made at the time as a part of the *res gestæ*, and also to confirm his testimony of the transaction as given on the trial. While error in excluding competent testimony is cured by afterwards admitting it from the same witness, it is not cured by admitting another to testify to the same purport. *State* v. *Murray*, 63 N. C., 31.

*Exception 3.*—The third exception is well taken. John Jones, on behalf of the State, had testified as an eye-witness to the homicide, and had stated that he was not drunk when it occurred. Had this been pertinent only to impeach his character, his answer would have been conclusive. *State* v. *Roberts*, 81 N. C, 605. But it went rather to his capacity to know and remember with accuracy what took place. It was error, therefore, to exclude proof offered to show that he was "very drunk on that occasion." It would have served to contradict him and to impair the credit to be given to his evidence, and would have been somewhat corroborative of the prisoner's theory of self defence. When a witness had testified as an eye-witness to a transaction, it would be competent to show that during the occurrence he was asleep or insensible, and, of course, also that he was very drunk.

*Exception 4.*—The evidence of the homicide was not circumstantial, and though the plea of self-defence was set up, it did not appear that the prisoner knew the character of deceased for violence. Evidence to show such character was, therefore, properly excluded. *State* v. *Turpin*, 77 N. C, 473; *State* v. *Hensley*, 94 N. C., 1022.

*Exception 5.*—The 9th prayer for instruction was erroneously refused. *State* v. *Sigman*, 106 N. C, 728, 731.

*Exceptions 6 and 11.*—The 10th prayer for instruction was properly denied. Much is left necessarily to the judgment of the officer in such cases, when acting in good faith and without malice. *State* v. *McNinch*, 90 N. C., 695; *State* v. *Sig-*

*man*, 106 N. C., 728; *State* v. *Pugh*, 101 N. C., 737. But when force so signal is used that death is caused thereby, there is no presumption of law that the officer acted without malice and in good faith, *i. e.*, without excess of force. The jury must judge of the reasonableness of the force used (*State* v. *Bland*, 97 N. C., 438), and the burden remains on the prisoner to show matter of excuse or mitigation. Good faith and the absence of malice are matters of defence.

*Exception 7.*—The 11th prayer for instruction was properly refused. Good faith and want of malice apply as to extent of force used when the arrest is legal, but does not validate an illegal arrest. *State* v. *Hunter*, 106 N. C., 796. *State* v. *Black*, 109 N. C., 856, does not apply to cases where an officer is on trial for using excessive force, nor where the transaction is not fully completed and finished. If the arrest was invalid, while third parties had no right to assault the officer to take away the prisoner (*State* v. *Armistead*, 106 N. C., 639), the officer was also guilty of an affray in attempting to hold the prisoner by force against the efforts of himself and friends.

*Exception 8.*—The 12th prayer for instruction was properly modified by inserting the words, "if the arrest was lawful."

*Exception 9.*—The 16th prayer for instruction was, "if the circumstances and facts of the homicide are left in doubt to the jury, and the jury are unable to say how the deceased came to his death and under what circumstances, the jury will render a verdict of not guilty." This would be correct in passing upon the killing, if not conclusively shown to have been committed by the prisoner. But if the killing is proved or admitted to have been done by the prisoner with a deadly weapon, as in this case, exactly the opposite of the prayer is the settled law in this State. *State* v. *Smith*, 77 N. C., 488; *State* v. *Gooch*, 94 N. C., 987. The use of a deadly weapon is proof of malice, for which the prisoner must show excuse or mitigation.

*Exception 10.*—The eighteenth payer was, "If there is a reasonable hypothesis, supported by the evidence, which is consistent with the prisoner's innocence, then it is the duty of the jury to acquit." This would be correct as to finding the killing to have been done by the prisoner when that fact is left in doubt. But when, as in this case, the killing by the prisoner has been established, the instruction would be illegal as to matters of excuse or mitigation, and the prayer must be construed with reference to the evidence. *State* v. *Tilly,* 25 N. C., 424. The law is too well settled in this State to be shaken now that if the killing is proved or admitted, all matters of excuse or mitigation devolve upon the prisoner. *State* v. *Johnson,* 48 N. C., 266; *State* v. *Ellick,* 60 N. C., 45; *State* v. *Haywood,* 61 N. C., 376; *State* v. *Willis,* 63 N. C., 26; *State* v. *Bowman,* 80 N. C., 432; *State* v. *Vann,* 82 N. C., 631; *State* v. *Boone,* 82 N. C., 637; *State* v. *Brittain,* 89 N. C., 481; *State* v. *Mazon,* 90 N. C., 676; *State* v. *Carland,* 90 N. C., 668; *State* v. *Gooch,* 94 N. C., 987; *State* v. *Thomas,* 98 N. C., 599; *State* v. *Byers,* 100 N. C., 512, and there are others to same effect. The case of *State* v. *Miller,* 112 N. C., 878, relied on by the prisoner, makes no change whatever in this well established rule.

*Exception 11.*—This raises the same point as Exception 6.

*Exception 12.*—Is without merit. The Court cannot single out a witness or witnesses and charge the jury, that if they believe those witnesses, to find so and so. *State* v. *Rogers,* 93 N. C., 523, and cases there cited. But there is no impropriety in saying to the jury, that if they believe a certain state of facts, as deposed to by certain witnesses, then the law applicable is so and so, when the Court, as in this case, has called to their attention the opposite state of facts as deposed to by other witnesses and instructed as to the law applicable thereto. This directs the jury's atention not to the credibility of such witnesses, but as to a certain hypothesis or state of facts, and the reference to the witnesses is simply

incidental to refresh them as to the evidence tending to show that particular state of facts.

*Exception 13.*—There is no ground for this exception. The proposition of law was correctly stated (*State* v. *Kirby*, 24 N. C., 201), and contained no expression of opinion that the prisoner was or was not a known officer.

*Exception 14.*—Is not well grounded. The prisoner has no cause to complain of the instruction. If so requested, the Judge might have told the jury that what would be excessive force in an individual in an ordinary encounter, might not be so in an officer resisting the escape or rescue of a prisoner. *State* v. *McNinch* and *State* v. *Sigman, supra.* But the omission was not error when the instruction was not asked. Nor is the officer clothed with authority to judge arbitrarily of the necessity for killing. It must be left to the jury to judge of the necessity in each case. *State* v. *Bland*, 97 N. C., 438. Nor do we think that this instruction is open to the charge of ambiguity, pointed out by the exception.          · Error.